Jennings and Mitzi OSBORNE *v.* Arleta POWER,
Dick Wallace, Joe H. Smith, Dennis Lucy, Tom Fiser,
Catherine Cockrill

93-1303                                   908 S.W.2d 340

Supreme Court of Arkansas
Opinion delivered October 30, 1995

*The Perroni Law Firm, P.A.*, by: *Samuel A. Perroni*; and John Pagan, for appellants.

*Wilson, Engstrom, Corum, Dudley & Coulter*, by: *Gary D. Corum*, for appellees.

BRADLEY D. JESSON, Chief Justice. This contempt proceeding, an original action, follows our ruling on December 5, 1994, in which this court, on *de novo* review, issued an injunction against Jennings and Mitzi Osborne, enjoining them from placing massive Christmas light displays on and about their home on Cantrell Road in Little Rock. *Osborne* v. *Power*, 318 Ark. 858, 890 S.W.2d 570 (1994). We ordered the Osbornes to abate the nuisance, and remanded the case to the chancellor for enforcement of the injunction.

Thereafter, the Osbornes filed a motion for stay of mandate, in which they stated their intentions to file a petition for a writ of certiorari with the United States Supreme Court, and suggested that the injunction was extremely broad and vaguely worded. In a per curiam opinion delivered on December 16, 1994, we denied the stay and reiterated our earlier directives, noting that the injunction was "short, concise, and readily understandable." *Osborne* v. *Power*, 319 Ark. 52, 890 S.W.2d 574 (1994). We once again explained that "massive commercial lighting displays generated by commercial transformers are not appropriate in quiet residential neighborhoods and violate express provisions of bills of assurances." *Id.* at 53.

Three days later, on December 19, 1994, the appellees filed a motion for contempt, alleging that Jennings Osborne had violated our orders by illuminating displays on December 17, 18, and 19, 1994. Upon considering this motion, we ordered Osborne to appear on December 27, 1994, to show cause why he should not

be held in contempt of court for willfully disobeying the injunction. *Osborne* v. *Power*, 319 Ark. 177, 890 S.W.2d 575 (1994). Osborne appeared with counsel at the show-cause hearing and pleaded not guilty.

On January 9, 1995, we denied the Osbornes' petition for rehearing on the merits of the original appeal, and appointed the Honorable George Cracraft as master to conduct an evidentiary hearing for the limited purpose of determining (1) whether Osborne reduced substantially the size and extravagance of the display at or about his home to a level which would not attract the large crowds that had been drawn to the neighborhood in the past; (2) whether Osborne continued massive Christmas light displays on and about his home that are calculated and do attract large numbers of visitors to the neighborhood; and (3) whether Osborne reduced the volume of any sound accompanying the display so that it is not audible from within the closest homes of neighbors. *Osborne* v. *Power*, 319 Ark. 239, 890 S.W.2d 577 (1995). In referring these questions to the master, we gave him the power to allow the parties to produce evidence *"including, but not limited to*, the comparative differences in the size, construction, and electrical energy used in the displays of 1993 and 1994, as well as the comparative foot and vehicular traffic involved." *Id.* at 241. (Emphasis added.) We specifically reserved for our ultimate determination the question of whether Osborne, by lighting his display on December 17, 18, and 19, 1994, willfully disobeyed our prior December 5 and 16, 1994, orders.

Following a hearing on March 13 and 14, 1995, the master submitted his report, which included findings of fact that Osborne had substantially reduced the size and extravagance of his display; that the 1994 display was not calculated to and did not attract unusual numbers of visitors to the neighborhood; that there was little or no sound generated by the display; and that all of Osborne's actions, if contemptuous, were taken on advice of counsel.

The appellees filed a notice of appeal of the master's findings, to which the Osbornes responded by filing a motion to strike the notice of appeal. In a per curiam opinion delivered May 8, 1995, we stated that we would treat the appellees' notice of appeal as an objection to the master's report, *see* Ark. R. Civ. P. 53(e)(2),

and Osborne's motion to strike the notice of appeal as a motion to strike the objection. *Osborne* v. *Power*, 320 Ark. 466, 896 S.W.2d 905 (1995). We asked the parties to brief their respective positions, which have been filed and are currently before us for consideration on the issue of whether Osborne is guilty of criminal contempt. The United States Supreme Court denied Osborne's petition for writ of certiorari on June 19, 1995.

■ Pursuant to Ark. R. Civ. P. 53(e)(2), this court must accept the master's findings of fact unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made by the master. *Casteel* v. *McCuen*, 310 Ark. 568, 838 S.W.2d 364 (1992). *See also* Reporter's Note to Rule 53. It is thus appropriate to examine the master's findings on each of the referred questions.

*I. Whether Osborne reduced substantially the size and extravagance of the display at or about his home to a level which would not attract the large crowds that had been drawn to the neighborhood in the past*

Jennings Osborne erected Christmas light displays in 1993 and 1994 on three lots of approximately equal size which front on Cantrell Road. At the hearing conducted by the master, these lots were referred to as the "east lot," the "main" or "residential lot," and the "west lot."

In finding that Osborne substantially reduced the size and extravagance of his 1994 Christmas display, the master relied on the testimony of Richard McCormac, a full-time employee of Osborne, who was in charge of hanging the lights. McCormac testified on his employer's behalf that in 1993, 265,480 lights were included in the display on the west lot, as compared to 89,760 lights in 1994, representing a 69 percent reduction. On the east lot, 268,080 lights were included in the 1993 display, as compared to 84,280 in 1994, representing a reduction of 67 percent. On the main or residential lot, 2,642,000 lights were included in the 1993 display, while only 560 lights were illuminated on this lot in 1994. According to McCormac's calculations, in 1994 the overall reduction of lights on all three lots as compared to 1993 was approximately 95 percent.

The master also made specific reference to the expert testimony of Steve Menhart, a professor of electronics at the University of Arkansas at Little Rock, who stated that in 1993, over 1600 KWH per hour of use in electrical energy was expended in the displays. In 1994, the consumption of energy was reduced to 124 KWH per hour. The energy consumption in 1994 was less than 7.7% of the energy required in previous years.

■ While we expressly did not limit the master to conducting inquiry into the comparative differences in the size, construction, and electrical energy used in the displays of 1993 and 1994, his finding on this question appears to be based in large measure on the relative differences in the number of lights used and the amount of electrical energy expended. Even so, we cannot say that this finding was clearly erroneous.

*II. Whether Osborne continued massive Christmas light displays on and about his home that are calculated to and do attract an unusually large number of visitors to the neighborhood*

The master answered this question in two parts: (1) whether the number of visitors to the neighborhood was reduced in 1994; and (2) whether Osborne's conduct was calculated to reduce the number of visitors to be drawn to the neighborhood. The master resolved each part of the question in Osborne's favor. While recognizing that there was conflicting testimony on the issue of whether unusual numbers of visitors were attracted to the neighborhood in 1994, the master concluded that the video cassettes introduced and exhibited at the hearing indicated a reduction over 1993.

■ In our order appointing the master, we stated that the master could allow the parties to present evidence of "the comparative foot and vehicular traffic involved." 319 Ark. at 241. Each of the appellees' two witnesses testified at the hearing that traffic was backed up during the 1994 display. Particularly, Sgt. Tom Bernard of the Little Rock Police Department stated that cars were lined up for 3/4 mile to the east, and 1/2 mile to I-430 to the west. This testimony, however, was contradicted by that of several defense witnesses, none of whom experienced or observed vehicular traffic problems, and all of whom observed few pedestrians during the 1994 display. When considering this testimony and viewing the videos presented, we do not conclude that the

master's finding as to the decrease in pedestrian and vehicular traffic in 1994 was clearly erroneous.

However, this is not the complete answer. Reductions over 1993 are not enough to resolve the question of whether the 1994 display attracted unusually large numbers of visitors to the neighborhood. The 1994 traffic on the three nights in question must be compared to "usual" Cantrell Road traffic, not to the mass congestion occasioned by the 1993 Osborne display. In short, the master used the wrong measuring stick with regard to the 1994 traffic.

The master recognized in his report that the more difficult question was whether Osborne's 1994 display was calculated to attract unusually large numbers of visitors. In answering this part of the second question, the master in effect rephrased the question again into a comparison of the 1994 display and the 1993 display. That was not the issue. The question referred was whether the 1994 display was calculated to attract an unusually large number of visitors to the neighborhood. The master found that Osborne relied upon advice of his counsel with regard to the 1994 display and that by resolving any doubts in Osborne's favor, "it would be a reasonable inference that his conduct was calculated to *reduce* the number of visitors to the neighborhood." Again, reduction is not the issue. Calculation is. Osborne might well have calculated to reduce the number of visitors as compared to 1993. The question, however, is whether the 1994 display constituted a massive Christmas display calculated to attract an unusually large number of visitors to the neighborhood. This question was really not addressed by the master except in terms of a reduction in visitors from prior years.

We accept the findings of the master on question two as they relate to the reduction in traffic generated by the 1994 display as compared with previous years and as to Osborne's inferred intention to reduce such traffic in comparison with past Christmas displays. Insofar as his findings on these questions exceed those issues, we hold that they are clearly erroneous.

*III. Whether Osborne reduced the volume of any sound accompanying the display so that it would not be audible from within the closest homes of the neighbors*

Again, the master answered this question in Osborne's

favor. The only evidence presented at the hearing was that there was little or no sound generated by the 1994 display. Even appellee Fiser testified that he did not recall any sound flowing from the 1994 display. Thus, we cannot say that the master's finding on this issue was clearly erroneous.

### Holding on contempt

The master recognized that the advice Osborne's attorney gave his client in five areas appeared to have been designed to reduce the number of visitors as compared to 1993:

(1) The size and density of the display was reduced by 95 percent;

(2) The public and media were given no advance notice of when the display would be illuminated;

(3) Visitors were not permitted to enter the residence compound as they had in the past;

(4) Osborne and his wife did not make any appearance during the display; and

(5) The display was illuminated for only three nights rather than seven nights as in previous years.

As the master and Osborne correctly note, we have recognized that, although acting on advice of counsel is not a complete defense to contempt, it is a strong mitigating factor. *Folsom* v. *State*, 216 Ark. 31, 224 S.W.2d 44 (1949) However, as this court said in the *Folsom* case:

> The fact that petitioner acted on advice of counsel is of course not a defense to the charge, but it does lessen the seriousness of the offense. The penalty in a case of this kind, however, serves a dual function. Not only is the contemnor to be punished for his conduct, but, as we said in *Poindexter* v. *State*, 109 Ark. 179, 159 S.W. 197, 46 L.R.A., N.S. 517, the dignity and authority of the court must be vindicated. Reliance upon the advice of counsel affects the first consideration, but it is nevertheless true that in the eyes of the general public the court's order has been flouted.

*Id.* at 35.

■ We have no hesitation in concluding that our December 5 and 16 orders have been flouted. Osborne maintained massive Christmas lights displays in 1994 after we expressly forbade him to do so. Undisputed evidence at the hearing indicated that the displays on the east and west lots were indeed of massive stature. The 1994 display contained some 174,000 lights. The "west wall" of lights was 30 feet high. The "east wall" of lights was 55 feet high. The strings of lights on these walls were separated by one inch in 1993, and four inches in 1994. The overall dimensions or "framework" of the displays on the east and west lots were unchanged. The only difference was fewer lights were illuminated. From a review of all the evidence, we hold that the 1994 display was calculated to and did attract an unusually large number of visitors to the neighborhood. With regard to calculation, two factors stand out. The placing of 174,000 lights illuminated over three adjacent lots in itself is a call for attention. It remained in 1994 a massive display, albeit on a smaller scale than previous years. It constituted a massive commercial lighting display which we deemed not to be appropriate in a quiet residential neighborhood with restrictive covenants. *Osborne* v. *Power*, 319 Ark. 52, 53, 890 S.W.2d 574, 575 (1994). In the recent motion picture *Field of Dreams*, it was said, "If you build it, they will come." Mr. Osborne built it, and they did come. He recognized that would occur as evidenced by the fact that he hired eight off-duty deputy sheriffs to control the traffic before the lights were turned on. This action demonstrates willful and intentional calculation to attract an unusually large number of visitors to the neighborhood. These eight off-duty officers were joined by sixteen Little Rock Police Department Officers to control the traffic. In light of the evidence, we conclude that Jennings Osborne is in contempt of court for willfully and intentionally illuminating massive displays on December 17, 18, and 19, 1994, in violation of the orders of this court.

### Punishment

■ In our February 20, 1995, mandate, we stated that the contempt proceedings were to be considered criminal in nature with a possible range of punishment as set forth in Ark. Code Ann. § 16-10-108 (Repl. 1994). This statute provides in part that every court of record shall have the power to punish, for criminal contempt, the "willful disobedience of any process or order lawfully

issued or made by it," § 16-10-108(a)(3), and allows for punishment up to fifty dollars ($50.00) and a ten-day jail sentence. We also referred the parties to our decision in *Carle* v. *Burnett*, 311 Ark. 477, 845 S.W.2d 7 (1993). In *Carle*, we recognized that § 16-10-108(a)(3) was not a limitation on the power of the court to impose punishment for disobedience of process. We observed that the term "process" in the sense of the statutes is a comprehensive term that includes "all writs, rules, *orders*, executions, warrants, or mandates issued during the progress of an action." *Id.*, *citing Arkansas Dep't of Human Servs.* v. *Clark*, 305 Ark. 561, 810 S.W.2d 331 (1991). (Emphasis added.) Thus, Osborne's actions in violating our December 5 and 16 orders fall within the inherent power of the court to punish for contempt, and we are not bound by the limitations set forth in § 16-10-108(a)(3).

Accordingly, we assess fines of $500.00 for each violation of our December 5 and 16 orders on December 17, 18, and 19. We sentence Osborne to ten days in the county jail, with ten days suspended.

We further order Osborne to pay $3500.00 in costs for the fee of the master, and $3500.00 in attorney's fees to the attorney for the appellees.

Case remanded to chancellor for enforcement of injunction.

Special Justice ERNIE E. WRIGHT joins in this opinion.

NEWBERN and BROWN, J.J., not participating.